**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| TECHNET,<br>    1420 New York Avenue NW<br>    Suite 825<br>    Washington, DC 20005,<br><br>and<br><br>NETCHOICE, LLC,<br>    1401 K Street NW<br>    Suite 502<br>    Washington, DC 20005,<br><br>                           Plaintiffs,<br><br>            - against -<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br>    1700 G Street NW<br>    Washington, DC 20552,<br><br>and<br><br>ROHIT CHOPRA, in his official capacity as Director of<br>the Consumer Financial Protection Bureau,<br>    1700 G Street NW<br>    Washington, DC 20552,<br><br>                           Defendants. | Case No.  25-118 |

**COMPLAINT**

Plaintiffs TechNet and NetChoice, LLC ("NetChoice") (together with TechNet, "Plaintiffs") for their complaint against Defendants the Consumer Financial Protection Bureau (the "CFPB" or "Bureau") and Rohit Chopra, in his official capacity as CFPB Director (together with the CFPB, "Defendants"), allege as follows:

## INTRODUCTION

1.     The Dodd-Frank Act authorized the CFPB to establish a "risk-based supervision program" for certain *nonbank* providers of consumer financial products and services—the first congressional authorization of supervision of nonbanks by a federal agency.   While federal agencies had long supervised banks, supervision of certain categories of nonbanks has historically been the province of state regulators with a few narrow exceptions.

2.     Congress authorized the Bureau to supervise only certain classes of nonbanks.  *See* 12 U.S.C. § 5514(a)(1)(A, C, D, E).   As relevant here, Congress empowered the CFPB to promulgate rules applying supervisory authority to "larger participant[s] of a market for other consumer financial products or services."  *Id*. at § 5514(a)(1)(B).

3.     Importantly, Congress did not give the CFPB free rein in choosing which nonbank entities to supervise under this "larger participant" authority.  Rather, the statute makes clear that the CFPB's supervision must be "risk-based" and that the Bureau "shall exercise its [supervision] authority" by assessing "the risks posed to consumers in the relevant product markets and geographic markets."  12 U.S.C. § 5514(b)(1)-(2).  Congress then specified the factors that the CFPB must consider in making that assessment—including "the risks to consumers created by the provision of such consumer financial products or services" and "the extent to which such institutions are subject to oversight by State authorities for consumer protection."  *Id*. at § 5514(b)(2)(C)-(D).

4.     The Act also requires that the Bureau consider "the potential benefits and costs to consumers and covered persons" when engaging in rulemaking.  12 U.S.C. § 5512(b)(2)(A)(i). Whether supervision in a particular market will reduce consumer risk, and whether state regulation

is already addressing any such risk, is highly relevant in determining whether the benefits of supervision outweigh the costs.

5.     These congressionally-imposed limits on the CFPB's supervisory authority are not surprising in light of the extraordinary power associated with federal supervision.  The CFPB employs its supervisory authority aggressively to:

- demand voluminous documents, records, materials, and other information from a supervised company at any time of its choosing;

- conduct on-site or remote examinations that can last months at a time and include interviews of company employees; and

- demand the company's attorney-client privileged information (at the CFPB's unilateral discretion).

CFPB supervision thus places enormous burdens on a supervised company, diverts financial and personnel resources, and inhibits innovation and the roll-out of new products and features. Congress accordingly left regulation of nonbanks to state agencies except where necessary and as clearly and expressly authorized.

6.     This action challenges the CFPB's final rule published on December 10, 2024, which purports to define a "market" for "general-use digital consumer payment applications" and targets the "larger participants" in that market for onerous supervision.  *See* "Defining Larger Participants of a Market for General-Use Digital Consumer Payment Applications," 89 Fed. Reg. 99,582 (Dec. 10, 2024) (the "Final Rule").[1]  Despite substantial criticism during the notice-and-comment process from dozens of stakeholders, including nonprofits, companies, industry

---

[1] A true and correct copy of the Final Rule is attached as Exhibit A to this Complaint.

associations, members of Congress, and other individuals, the CFPB proceeded to issue a Final Rule with several fatal flaws.

7.    Notably, while the CFPB proceeded with its Final Rule over considerable opposition, other federal agencies and regulators—including the Federal Reserve, FDIC, and Office of the Comptroller of the Currency—announced in November 2024 that they were suspending all pending major rulemakings at least until President-elect Trump takes office.[2]

8.    The CFPB wrote the Final Rule with the express aim that it would target specific market participants, corresponding almost exactly to the pejoratively-labelled "Tech Giants" that Director Chopra has been pursuing ever since he became the head of the CFPB.[3]  Indeed, Director Chopra has made clear that the purpose of the Final Rule is to "crack down" on "large technology firms," and is the culmination of his efforts throughout his tenure at the Bureau to do just that.[4]

9.    The Final Rule is invalid and unlawful under the Dodd-Frank Act and the Administrative Procedure Act (APA) for several fundamental reasons.  *First,* the CFPB exceeded its statutory authority, and acted arbitrarily and capriciously, by asserting that consumer risk—a fundamental animating principle of the Dodd-Frank Act and a touchstone of the nonbank

---

[2] *See* ABA Banking Journal, *Bank Regulators: No Plans to Move Forward With Major Rulemakings Until Next Year* (Nov. 20, 2024), https://bankingjournal.aba.com/2024/11/bank-regulators-no-plans-to-move-forward-with-major-rulemakings-until-next-year/.

[3] *See* Hugh Son, *CFPB Expands Oversight of Digital Payments Services Including Apple Pay, Cash App, and PayPal,* CNBC (Nov. 21, 2024), https://www.cnbc.com/2024/11/21/cfpb-expands-oversight-of-apple-pay-other-digital-payments-services.html ("CNBC Article").

[4] *See* Lynne Marek and James Pothen, *CFPB Wants to Bring Big Tech Firms Under Its Jurisdiction,* LEGALDIVE (Nov. 7, 2023), https://www.legaldive.com/news/cfpb-rohit-chopra-rule-proposal-apple-google-digital-wallet-app/699197/; Douglas Gillison and Hannah Lang, *U.S. Consumer Watchdog Proposes Rules for Big Tech Payments, Digital Wallets,* REUTERS (Nov. 7, 2023), https://www.reuters.com/technology/us-consumer-watchdog-proposes-rules-big-tech-payments-digital-wallets-2023-11-07/ (describing the Proposed Rule as Director Chopra's attempt "to assert the agency's full authority over Big Tech, a sector he has frequently criticized for privacy and competition issues" and noting that Director Chopra has "steadily increased CFPB scrutiny of the sector" since becoming Director in 2021).

supervision program—need not be considered in defining a "market" subject to its supervision authority.  The Bureau has sought to define a purported market for supervision without finding— in accordance with the statutory structure that focuses on consumer risk—that consumers in that market were being harmed or that there were any consumer protection risks that CFPB supervision could or would remedy, much less any that were not already being addressed by state-level supervision.  To the contrary, the CFPB has taken the astonishing position that it need not even try to "make findings regarding risk to issue this larger participant rule."  89 Fed. Reg. at 99,597.  For that reason alone, the Final Rule must be vacated.

10.     Eschewing objective criteria and other intelligible principles in favor of its own unconstrained discretion, the Bureau simply disclaims the need to determine whether it has selected an appropriate "market" in any legal or commonsense meaning of that term, even though the Dodd-Frank Act required it to examine the "risks posed to consumers" both in the "relevant product market[]" and in the "geographic market[]."  *See* 12 U.S.C. § 5514(b)(2).  According to the Bureau, it "need not conclude before issuing a [larger participant rule] that the market identified in the rule has a higher rate of noncompliance, poses a greater risk to consumers, or is in some other sense more important to supervise than other markets."  *See* "Defining Larger Participants of a Market for General-Use Digital Consumer Payment Applications," 88 Fed. Reg. 80,197, 80,200 n.24 (Nov. 17, 2023) (the "Proposed Rule").  That position runs headlong into the major questions and non-delegation doctrines, as the Bureau is claiming authority over a matter of vast economic and political significance without any—or, at most, "wafer-thin"—statutory grounding. *See West Virginia v. EPA*, 597 U.S. 697, 721-723 (2022) (citing several cases "from all corners of the administrative state" where Congress did not "confer the power the agency has asserted").

11.     The Bureau's standardless approach to determining its own nonbank supervisory jurisdiction was not at all what Congress intended and undermines notice-and-comment rulemaking and judicial review.  If the CFPB is entitled to simply ignore harms or risks to consumers, there is no principle or rule of decision by which to assess the CFPB's identification of the market for supervision, the exclusions the CFPB made to the market definition, and the thresholds the CFPB selected to define larger participants.  This Court should reject the Bureau's sweeping interpretation of its own regulatory powers.

12.     *Second*, because the CFPB identifies no consumer risk or gap in regulatory oversight that it seeks to fill, or any other concrete problem it seeks to resolve via the Final Rule, it also acted arbitrarily and capriciously under the APA.  *See*, *e.g.*, *ALLTEL Corp. v. FCC*, 838 F.2d 551, 556-561 (D.C. 1988) (arbitrary and capricious to rely on "hypotheses" and "questionable assumptions" in place of "reasoned explanation for agency action").

13.     *Third*, the Bureau brushed aside commenters' legitimate objections that the Bureau was lumping together various disparate products—all with different risk profiles and applicable regulations—into a "one-size-fits-all" contrived market.  Specifically, the Final Rule shoehorns into the Bureau's "market" two distinct products: first, "funds transfer functionalities," such as peer-to-peer (P2P) payment applications and many others, such as applications that charge or otherwise offer a payment method for consumer purchases; and second, "wallet functionalities," including those that merely store consumers' credit or debit cards and charge those cards to facilitate a payment to a merchant.  There are fundamental differences between the regulatory standards implicated by funds transfer functionalities and wallet functionalities, given that the latter commonly do not store funds and merely transmit payment credentials (such as a consumer's credit card information) to facilitate a purchase from a merchant.  The Dodd-Frank Act directs the

Bureau to deploy its authority to ensure compliance with the Federal consumer financial laws, and these groups of products implicate entirely distinct laws. Yet the Bureau arbitrarily and capriciously dealt with these disparate products and regulatory concerns in a single, blunt manner.

14. Indeed, the Final Rule's two categories disguise its sweeping breadth. The Final Rule has conflated several distinct markets into one by lumping together (i) peer-to-peer services (*i.e.*, a platform allowing two individuals to connect directly to complete a transaction), (ii) stored value accounts (*i.e.*, a service that stores funds that can be accessed and transferred at a later time), (iii) digital-only banking services (*i.e.*, banking services that are only available through digital platforms), (iv) merchant payment processing (*i.e.*, a service allowing businesses to accept payments from customers), and (v) payment credential management (*i.e.*, the process of controlling and managing payment credentials). The Bureau acknowledged differences in these products and services in responding to the numerous comments it received, but wrongly claimed that it simply could ignore them. *See* 89 Fed. Reg. at 99,603, 99,615. Given the goals of supervision specified in the Dodd-Frank Act, attempting to address the specific regulatory concerns (if any) raised by separate products in the context of a single contrived market definition is arbitrary and capricious.

15. *Fourth*, the CFPB has not only set its sights on the covered companies' funds transfer and wallet application products, but it also asserts that its broad supervisory oversight authority applies to *any and all consumer financial products and services offered company-wide*. The Bureau takes this expansive view of its own supervisory powers regardless of how remote the company's activity may be from the products and services that purportedly qualify for larger participant-based supervision in the first place. The CFPB's approach is particularly problematic given the broad and diverse business models of the companies that it is singling out; by contrast,

prior "larger participant" rulemakings concerned companies whose operations were more limited.[5] Most importantly, the CFPB points to no statutory authority for that unbridled power. The roving, unchecked, and unmoored supervisory authority to which Defendants lay claim is flatly contrary to the statutory text and congressional purpose, will stifle new product development, and will impose outsized regulatory costs on any firms it chooses to target.

16.    *Fifth*, the CFPB has failed to consider what is good for consumers—which is, after all, the Bureau's entire congressional mandate—by failing to satisfy the cost-benefit requirements demanded not only by the APA's general requirement that an agency "'consider[ ] . . . the relevant factors," *MetLife, Inc. v. Fin. Stability Oversight Council,* 177 F. Supp. 3d 219, 240 (D.D.C. 2016), "but also by specific provisions of the Dodd-Frank Act, which demand attention to 'the potential benefits and costs to consumers and covered persons' that come from regulation." *PayPal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 43 (D.D.C. 2024) (citing 12 U.S.C. § 5512(b)(2)). The CFPB admits, for example, that it had no quantitative data on which to base its analysis, and relied on speculation about the effects of supervision on companies' levels of compliance. *See* 89 Fed. Reg. at 99,643. The Bureau's failure to adequately conduct a cost-benefit analysis is all the more surprising given its years-long inquiry into these same companies' payment products pursuant to its market monitoring authority.[6] After two orders demanding information and years of purported study, the Bureau has failed to point to any findings from that inquiry to support its selection of the purported market for larger participant supervision. Had the Bureau's market monitoring efforts indicated

---

[5] The CFPB has previously issued rules exercising supervisory authority over larger participants in five other markets: consumer reporting, consumer debt collection, student loan servicing, international money transfers, and automobile financing. *See* 89 Fed. Reg. at 99,582 n.6.

[6] *See, e.g.*, *CFPB Orders Tech Giants to Turn Over Information on their Payment System Plans*, CFPB (Oct. 21, 2021), https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-tech-giants-to-turn-over-information-on-their-payment-system-plans/ ("2021 Market Monitoring Order").

the need for supervision, based on the data that it presumably gathered, one would have expected the Bureau to have relied on and cited that data in support of its rulemaking here. That it failed to do so speaks volumes.

17.    The Bureau's cost-benefit "analysis" is nonsensical even on its own terms: using implausibly low cost figures, it estimated that the costs of the Final Rule would be low because it would not require substantial ongoing compliance efforts by companies aside from periodic exams, yet at the same time estimated that the benefits of the Final Rule would be high because companies would make significant compliance changes in anticipation of potential exams. And the Bureau failed to adequately consider the Final Rule's costs to consumers, admitting that the costs of supervision could be passed through to consumers but that the Bureau lacked data to assess the potential increase in consumers' costs. The Bureau also failed to fulfill its statutory mandate to consider how its rulemaking could reduce access to consumer financial products and services, including by chilling innovation in the market. The Bureau further failed to find—nor could it— that the benefits of the Final Rule outweighed its costs. In short, the CFPB's cost-benefit analysis was superficial and fell far short of satisfying its statutory obligations.

18.    Nor is this the first time that the CFPB has issued an arbitrary and capricious Final Rule on a deficient record. Just last year, this Court vacated a similarly "prescriptive and burdensome" CFPB rule regulating digital wallets and prepaid accounts because the Bureau engaged in the same "missteps" replayed here. *PayPal*, 728 F. Supp. 3d at 45. As here, the CFPB in *PayPal* failed to "identify a well-founded, non-speculative reason for subjecting digital wallets" to the rule it promulgated; failed to adequately "perform a reasoned cost-benefit analysis" before issuing the rule; "ignored key differences" among the products it was trying to "shoehorn[]" into its "regulatory regime"; "cavalierly" dismissed those distinctions; and relied on "pure speculation"

as a "substitute for a reasoned examination of the facts." *Id.* at 34-41 and n.3.  And as here, the Bureau failed to show what "consumer risks" the rule was even "meant to alleviate" in its haste to "dream[] up a problem in search of a solution." *Id.* at 40-41.

19.     For these reasons and those set forth below, this Court should declare that the Final Rule exceeds the Bureau's statutory authority, is arbitrary and capricious, and is contrary to law. It should therefore vacate and set aside the Final Rule and enjoin any enforcement efforts.

## PARTIES

20.     Plaintiff TechNet is a 501(c)(6) nonprofit corporation headquartered in Washington, D.C.  TechNet's diverse membership includes dynamic American businesses ranging from startups to iconic companies, representing over 4.5 million employees and countless customers in the fields of financial technology, information technology, artificial intelligence, and e-commerce, among others. Its mission is to support innovation and competition to allow America's technology industry to flourish.  Based on press regarding the Final Rule and prior statements from the CFPB, Plaintiffs anticipate that the CFPB will seek to subject certain of TechNet's members, or their relevant subsidiaries, to Bureau supervision as "larger participants" under the Final Rule based on allegations that these member companies meet the Final Rule's transaction threshold and thus fall within the scope of the Final Rule.[7]

21.     Plaintiff NetChoice is a Delaware limited liability company headquartered in Washington, D.C.  It is a nonprofit trade association for Internet companies dedicated to advancing free enterprise and free expression in the internet and technology sectors, including by facilitating consumer choice, reasonable regulation, and abundant competition.  Based on press regarding the

---

[7] *See* TechNet Members, https://www.technet.org/our-story/members/ (Jan. 14, 2025).

Final Rule and prior statements from the CFPB, Plaintiffs anticipate that the CFPB will seek to subject certain of NetChoice's members, or their relevant subsidiaries, to Bureau supervision as "larger participants" under the Final Rule based on allegations that these member companies meet the Final Rule's transaction threshold and thus fall within the scope of the Final Rule.[8]

22.    Plaintiffs bring this action on behalf of their respective members to advance their members' interest—particularly those members that offer digital consumer payment applications and who allegedly meet the Final Rule's transaction threshold.  As part of their advocacy efforts for their respective members, each of the Plaintiffs is committed to protecting against administrative overreach that could create a chilling effect on their member companies' innovation and ingenuity, which drive economic growth and benefit millions of consumers.

23.    Because the Proposed Rule threatened to impose onerous and burdensome obligations on certain of Plaintiffs' members, Plaintiffs each submitted comments opposing many features of the Proposed Rule, including features that were later included in the Final Rule over Plaintiffs' objections.[9]

24.    Defendant Consumer Financial Protection Bureau is a federal administrative agency headquartered in Washington, D.C.  The Bureau is subject to the APA pursuant to 5 U.S.C. §§ 702-706.

25.    Defendant Rohit Chopra is the Director of the Bureau.  He is sued in his official capacity and is also subject to the APA pursuant to 5 U.S.C. § 551(1).  Chopra acted under color of law at all relevant times.

---

[8] *See* NetChoice Members, https://netchoice.org/about/ (Jan. 14, 2025).

[9] *See* NetChoice Comment Letter, Docket No. CFPB-2023-0053 (Jan. 7, 2024), https://www.regulations.gov/comment/CFPB-2023-0053-0020 ("NetChoice Comment Letter"); TechNet Comment Letter, Docket No. CFPB-2023-0053 (Jan. 8, 2024), https://www.regulations.gov/comment/CFPB-2023-0053-0035 ("TechNet Comment Letter").

## JURISDICTION AND VENUE

26.    Plaintiffs bring this action under the APA, 5 U.S.C. §§ 551 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the United States Constitution and the APA.  The Court has the authority to grant the requested declaratory and injunctive relief under the APA, 5 U.S.C. §§ 702-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

27.    Plaintiffs each have associational standing to bring this suit on behalf of, and to seek judicial relief for, their respective members.  As set forth above, certain of Plaintiffs' members are directly and adversely affected by the Final Rule and accordingly have standing to sue in their own right.  Those members who allegedly meet the Final Rule's transaction threshold will be harmed by the Final Rule because if they are designated for Bureau supervision, they may have to, among other things, produce voluminous records, documents, and other information to the Bureau; submit to employee interviews; issue reports and audits relating to their compliance; disclose privileged information; and set aside their primary business and operation duties to prepare for and respond to the Bureau's examination process.  Those members will thus face substantial compliance burdens and costs, including significant legal costs, once they are designated for supervision.  Neither the claims asserted nor the relief requested requires an individual member to participate in the suit.  *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because it is an action against an agency and an officer of the United States resident in this District.  Venue is also proper in this District because each Plaintiff resides here.

## FACTS

### A.  Statutory Background and Structure

29.    In the wake of the 2008 financial crisis, Congress enacted, as part of the Dodd-Frank Act, the Consumer Financial Protection Act of 2010 (CFPA), Pub. L. 111-203, 124 Stat. 1955 (2010).  In the CFPA, Congress created the Bureau based on its concern that existing federal financial services regulatory agencies were not adequately focused on protecting consumers in light of their other responsibilities.  *See* 12 U.S.C. § 5511(b).  Congress made clear that the Bureau's sole and limited responsibility was consumer financial protection, and to that end established the CFPB as an agency tasked with "enforc[ing] Federal consumer financial law."  12 U.S.C. § 5511(a); *see also id.* at §§ 5481-5603.  "Federal consumer financial law" comprises 18 enumerated consumer laws, plus the CFPA itself, which is Title X of the Dodd-Frank Act (including 12 U.S.C. § 5514).  *See* 12 U.S.C. § 5481(14).

30.    In the Dodd-Frank Act, Congress granted the Bureau limited supervisory authority over financial services companies.  With respect to banks, the Bureau was authorized to supervise only "very large" banks and credit unions—those with more than $10 billion in assets—and their affiliates, for consumer financial protection purposes.  12 U.S.C. § 5515.  The Bureau has some additional limited authority to require reports from "other" smaller banks and credit unions, but only "as necessary to support the role of the Bureau in implementing Federal consumer financial law," and similarly "to assess and detect risks to consumers and consumer financial markets."  12 U.S.C. § 5516.

31.    The Bureau was also granted authority under 12 U.S.C. § 5514(a) to supervise certain *nonbank entities* in far more limited circumstances.  Congress granted supervisory authority over nonbank companies that operate in several specific areas that it considered high risk,

including mortgage lending, mortgage servicing, private student loan lending, and payday lending. *See id.* § 5514(a)(1)(A, D, E). Congress authorized the Bureau to identify "market[s]" for "other consumer financial products or services" and supervise the "larger participant[s]" in such markets with respect to their products or services within those markets—*i.e.*, the CFPB's "larger participant" authority. *Id.* at § 5514(a)(1)(B). And Congress authorized the Bureau to supervise a nonbank company that does not fall within an express statutory category or is not a larger participant in a market defined by rule, but only if the Bureau determines that the company "poses risks to consumers." *Id.* at § 5514(a)(1)(C).

32.    Congress prescribed specific requirements that the CFPB must meet in order to invoke its "larger participant" supervision authority. *First*, as with all of its rulemakings, the CFPB must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services," as well as the "impact of proposed rules" on the companies that will be subject to supervision. *Id.* at § 5512(b)(2)(A)(i)-(ii). *Second*, recognizing that the Bureau would need adequate information to make a determination consistent with its cost-benefit analysis obligations, Congress further provided that, in promulgating a larger participant rule, the CFPB must consult the Federal Trade Commission and, more generally, "the appropriate prudential regulators or other Federal agencies . . . regarding consistency with prudential, market, or systemic objectives administered by such agencies." *Id.* at § 5512(b)(2)(B), § 5514(a)(2). *Third,* to ensure informed rulemaking, the CFPB must "gather and compile information" from various sources, including examination reports, consumer complaints, voluntary surveys and voluntary interviews, and available databases. *Id.* at § 5512(c)(4)(B)(i). *Fourth*, the CFPB's larger participant rulemaking is subject to the APA's procedures and requirements. *See Owner-Operator Indep. Drivers Ass'n, Inc. v.*

*Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007); *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991).

33.     Moreover, Congress also required the CFPB to "monitor for risks to consumers in the offering or provision of consumer financial products or services," including by considering the "likely risks and costs to consumers associated with buying or using a type of consumer financial product or service." *Id.* at § 5512(c)(1-2).

34.     Further reflecting its intention to establish a nonbank supervision program centered on risk to consumers, Congress directed the CFPB to operate a "risk-based supervision program." 12 U.S.C. § 5514(b)(2).  Congress expressly stated that in connection with a "risk-based supervision program," the Bureau "shall" exercise its authority "in a manner designed to ensure that such exercise . . . is based on the assessment by the Bureau *of the risks posed to consumers* in the relevant product markets and geographic markets" by "taking into consideration" certain enumerated factors. *Id.* (emphasis added).  Those factors include "(A) the asset size of the covered person; (B) the volume of transactions involving consumer financial products or services in which the covered person engages; (C) the risks to consumers created by the provision of such consumer financial products or services; (D) the extent to which such institutions are subject to oversight by State authorities for consumer protection; and (E) any other factors that the Bureau determines to be relevant to a class of covered persons."  12 U.S.C. § 5514(b)(2).

35.     Congress also specified the purposes of the Bureau's supervisory activities over qualifying nonbank entities: (1) assess compliance with Federal consumer financial law; (2) obtain information about a supervised entity's activities and compliance systems or procedures; and (3) detect and assess "risks to consumers and to markets for consumer financial products or services."  12 U.S.C. § 5514(b)(1).

**B.  The Burdens and Costs of the CFPB's Broad Supervisory Powers**

36.    CFPB supervision is a "comprehensive, ongoing process of pre-examination scoping and review of information, data analysis, on-site examinations, and regular communication with supervised entities and prudential regulators, as well as follow-up monitoring."[10]

37.    The Bureau's supervision practices are detailed in a 1,814-page "Supervision and Examination Manual" (the "Exam Manual").[11]  The Exam Manual describes the Bureau's extremely detailed processes for supervising a company—a "far-reaching" exercise in which Bureau examiners "request internal company data, interview a company's managers and employees, and observe operations at company facilities." *Chamber of Commerce of United States of America v. CFPB*, 691 F. Supp. 3d 730, 733, 746 (E.D. Tex. 2023) (granting declaratory and injunctive relief barring CFPB examiners from scrutinizing companies for discrimination against unspecified protected classes because the CFPB's updates to the Exam Manual were beyond the Bureau's constitutional and statutory authority).

38.    In a typical examination conducted pursuant to the CFPB's supervisory authority, the CFPB first sends a "Request for Information" seeking documentation and data, including policies and procedures, training materials, and consumer complaints.  The scope of the documentation and information requested is "often broad and can include highly sensitive and confidential data."  *See* Brief of *Amici Curiae* Bank Policy Institute at 21, *Chamber of Commerce*

---

[10] *See* CFPB, *Supervision* (last visited Jan. 14, 2025), https://www.consumerfinance.gov/about-us/careers/supervision/; *see also* 12 U.S.C. § 5514(b) (authorizing the CFPB both to conduct examinations and to require reports from entities subject to supervision).

[11] *See generally* CFPB, *Supervision and Examination Manual* (Sept. 2023), https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual.pdf.

*of United States of America v. CFPB*, No. 23-40650 (5th Cir. Oct. 14, 2024), ECF No. 87.  CFPB examiners then go onsite—often for weeks or months at a time—to scrutinize the supervised entity's practices, conduct interviews with personnel, and review additional documents and information.  *Id.*  Adding to the burdens and expenses involved, the CFPB can at its discretion require the supervised entity to issue reports and audits relating to its compliance, and it can also demand quarterly, standing productions of materials and other information.  *See* Exam Manual, Part I ("Compliance Supervision and Examination") and Part II(A) ("Examination Procedures").

39.    One commenter explained that "[t]he full examination process, including responding to the Bureau's follow-up requests, typically spans multiple months and oftentimes longer than a year.  The CFPB expects prompt and thorough responses throughout the supervisory process . . . .  It often takes dozens of employees, who must set aside their primary business or operational duties, to assist in preparing examination responses because responses often require collaboration across departments, the creation of new reports and data fields, and engineers building new code."  Financial Technology Association Comment Letter at 7 (Jan. 8, 2024), Docket No. CFPB-2023-0053,  https://www.regulations.gov/comment/CFPB-2023-0053-0042 ("FTA Comment Letter"); *see also* NetChoice Comment Letter at 7-8 ("Overnight, an entire industry would be transformed from one dedicated to developing products that best serve customers and turn it into one that gathers documents for federal investigators with dubious authority. As ever, compliance costs will begin to compete with innovation for the primary attention of each regulated nonbank.").  As explained in greater detail below in connection with the Bureau's inadequate calculation of the Final Rule's costs, the CFPB has grossly underestimated the heavy compliance burdens and substantial costs that companies incur in preparing for and responding to a CFPB examination, even though the Bureau has been supervising large banks and

other nonbank entities for years and should know well the significant costs and burdens associated with supervision.

40.     Once the CFPB initiates supervision, it views itself as facing no practical limitations to its authority to demand information and compel compliance with whatever requirements it imposes, regardless of whether they fall within the Bureau's regulatory mandate.  In doing so, the CFPB aggressively demands attorney-client privileged information and may challenge a company's proposed redactions, with potentially damaging consequences for the supervised company.

41.     The CFPB thus wields enormous power over any company that it designates for supervision.  The Bureau can seek largely unfettered access to troves of documents and materials; it can coerce compliance with supra-regulatory standards; and its broad supervisory powers are backed with the threat of enforcement and "coupled with extensive adjudicatory authority," including the ability to conduct administrative proceedings and, when it acts as an adjudicator, grant legal or equitable relief.  *See Seila Law LLC v. CFPB*, 591 U.S. 197, 219 (2020) (describing the "coercive power of the state" wielded by the CFPB).

### C.  The Proposed Rule and Final Rule

42.     On November 17, 2023, the Bureau published the Proposed Rule, 88 Fed. Reg. at 80,197.  The Proposed Rule defined a new market for "general-use digital consumer payment applications" and set forth a test for "larger participants" in that market that would be subject to Bureau supervision.

43.     Defining the "market" is a fundamental prerequisite for determining who is a "larger participant" in that market.  The market under the Proposed Rule broadly encompassed entities providing a "general-use digital consumer payment application," defined to mean a

"covered payment functionality through a digital application for consumers' general use in making consumer payment transaction(s)."  88 Fed. Reg. at 80,201.

44.    "Covered payment functionalities" under the Proposed Rule encompassed two categories of distinct products: a "funds transfer functionality" and a "wallet functionality."  88 Fed. Reg. at 80,205.  "Funds transfer functionality" meant consumer payment transactions that involve "(1) receiving funds for the purpose of transmitting them; or (2) accepting and transmitting payment instructions."  *Id.*  "Wallet functionality" meant "a product or service that: (1) Stores account or payment credentials, including in encrypted or tokenized form; and (2) Transmits, routes, or otherwise processes such stored account or payment credentials to facilitate a consumer payment transaction."  *Id.*

45.    The Proposed Rule set forth two criteria for a nonbank to be considered a "larger participant" in the proposed market: (1) its annual volume of covered consumer payment transactions would have to exceed the proposed threshold of 5 million in the prior calendar year, and (2) it could not be a small business concern, as defined by the Small Business Administration. 88 Fed. Reg. at 80,208.[12]  The Bureau estimated that the transaction volume threshold in the Proposed Rule would bring 17 entities within the Bureau's supervisory authority. *Id.* at 80,210.

46.    The Bureau requested comments on the Proposed Rule, and the comment period lasted from November 17, 2023, to January 8, 2024.  89 Fed. Reg. at 99,592.  Despite various requests to extend the comment period due to multiple intervening holidays and the many other CFPB pending rulemakings requiring comment, the Bureau declined to do so and improperly cited its receipt of comments as proof that the comment period was adequate.  *Id.*

---

[12] The Proposed Rule included exceptions for certain international money transfers, foreign exchange transactions, sales from online marketplaces, extensions of consumer credit, and payment applications that are not of "general use." 88 Fed. Reg. at 80,215.

47.    In all, the Bureau received 59 comments from stakeholders, nonprofits, companies, industry associations, members of Congress, and others.  89 Fed. Reg. at 99,583.  Reaction to the Proposed Rule from commenters was predominantly negative: numerous commenters raised a host of serious concerns about the Proposed Rule, including, among many others, that the Bureau: (1) failed to identify any risks to consumers it was seeking to address through the Proposed Rule; (2) proposed an invalid and incoherent market definition; (3) claimed supervisory authority not only over the specific financial products and services that purportedly qualified the company for supervision, but over all of the company's consumer financial products and services; and (4) failed to adequately perform a cost-benefit analysis.

48.    Despite the numerous objections and comments it received, the Bureau issued the Final Rule on November 21, 2024 and published it on December 10, 2024.  *See* 89 Fed. Reg. at 99,582.  The Final Rule largely adopts the Proposed Rule, with only a few notable changes, none of which remedy the fundamental concerns expressed by commentors.  Among other things, the Final Rule increased the transaction threshold from the proposed 5 million to 50 million transactions in the preceding calendar year.  *Id.* at 99,639.  As a result, the CFPB "estimates" that the Final Rule will cover seven companies.[13]  *Id.*  The Bureau's stated rationale for this change was a fear that supervision at a lower threshold could harm "new entrants and others with smaller volumes"—a concession to the severe burdens associated with supervision.  *Id.* at 99,640.  The Final Rule also limited the definition of "annual covered consumer payment transaction volume" to transactions denominated in U.S. dollars, which excludes transfers of digital assets, including crypto-assets.  *Id.*  In making this change, the Bureau cited general concerns about

---

[13] Based on press reports, six of these seven companies are Plaintiffs' members.  *Compare* CNBC Article, *supra* n.3 (identifying expected covered companies) *with* lists of Plaintiffs' members, *supra* n.7-8.

"administrability." *Id.* And while the Proposed Rule focused on the location of transactions—counting only those transactions initiated in a State—the Final Rule counts any transaction initiated by or on behalf of a United States resident. *Id.* at 99,612.

## THE FINAL RULE IS UNLAWFUL AND INVALID

### A. The CFPB Rejected Every Objective Standard for Limiting Its Authority

#### 1. The CFPB Purported to Create a "Risk-Based Supervision Program" Without Assessing Consumer Risk

49.    In the Final Rule, the CFPB took the extraordinary position that notwithstanding Congress's focus on risk-based supervision, it could designate a nonbank market for larger participant supervision without any regard to consumer harm or consumer risk. It therefore pointedly declined to cite evidence or make findings about whether consumers in the "market" it identified were in fact experiencing harm or facing any risks. Nor, for that matter, did it make any findings about whether and how CFPB supervision would address or ameliorate any such risks. This position contravenes the statutory emphasis on risk-based supervision, including that the Bureau "shall" conduct a "*risk-based* supervision program" and tailor its supervision of nonbanks to "risks posed to consumers in the relevant product markets and geographic markets." 12 U.S.C. § 5514(b)(2) (emphasis added); *see Dubin v. United States*, 599 U.S. 110, 121-122, 127 (2023) (explaining "a title is especially valuable [where] it reinforces what the text's nouns and verbs independently suggest" and relying on a title that, as here, had "a focused meaning" and was "mutually reinforcing" with the statute's text).

50.    When the Bureau introduced the Proposed Rule, it boldly disclaimed any need to assess the risks to consumers from the products and services in the market it sought to define. The CFPB further claimed that it need not "determine the relative risk proposed by this market as

compared to other markets."  88 Fed. Reg. at 80,200 n.24; *see also* 89 Fed. Reg. at 99,585 n.27

(reiterating this statement in its Final Rule).  According to the CFPB, citing its own flawed

precedent, it "need not conclude before issuing a [larger participant rule] that the market identified

in the rule has a higher rate of non-compliance, poses a greater risk to consumers, or is in some

other sense more important to supervise than other markets."  88 Fed. Reg. at 80,200 n.24

(alteration in original).  Based on this expansive view of its own rulemaking authority under the

Dodd-Frank Act, the Bureau, in direct contravention of the Act, entirely "fail[ed] to identify

specific harms to consumers that it seeks to address"—as multiple commenters, including each of

the Plaintiffs, explained.[14]

51.    Despite commenters' well-founded objections on this front, the Bureau did nothing

to address them in the Final Rule.  Instead, it doubled down on its position by refusing to analyze

or assess harm or risks to consumers and declining to base its market identification on these factors

in any way.  Making no attempt to reconcile its approach with the text of 12 U.S.C. §§ 5512 and

5514, the CFPB stated simply that it "disagrees . . . that in a larger participant rule the CFPB is

required to assess the degree or prevalence of risks to consumers, potential violations of law, or

other specific harms occurring in the described market" and admitted "it [did] not do so here."  89

Fed. Reg. at 99,596-97.  This fundamental error pervades the Final Rule: the Bureau repeatedly

emphasized that it was "not required to make findings about relative risks in a market to justify

issuing (or proposing) a larger participant rule," or otherwise "required to consider in this

rulemaking the kinds of detailed information about mitigation of concrete risks contemplated by

---

[14] TechNet Comment Letter at 6-7; NetChoice Comment Letter at 6; FTA Comment Letter at 5-6; Amazon.com Comment Letter at 12 (Jan. 8, 2024), Docket No. CFPB-2023-0053, https://www.regulations.gov/comment/CFPB-2023-0053-0058 ("Amazon.com Comment Letter"); Members of Congress Comment Letter at 2 (Jan. 30, 2024), Docket No. CFPB-2023-0053, https://www.regulations.gov/comment/CFPB-2023-0053-0063 ("Members of Congress Comment Letter").

[commenters]." *Id.* at 99,592, 99,596.  As discussed below, the Bureau's admitted failure to make any such assessments or findings renders its resulting rulemaking illegitimate.

52.     In flatly refusing to cite any evidence or make any findings about whether there are *any* risks to consumers—much less meaningful or substantial risks—posed by the products and services covered by the Final Rule, the CFPB exceeded two separate limits on its authority under the Dodd-Frank Act.  The statute requires that supervisory authority be tethered to consumer risk and mandates attention to a rule's impact on compliance with the Federal consumer financial laws and its costs and benefits.

53.     The touchstone of the CFPB's nonbank supervision regime is that it must be "risk-based."  Congress specifically provided that the CFPB must exercise its nonbank supervisory authority "in a manner designed to ensure that such exercise . . . is based on the assessment by the Bureau of the risks posed to consumers in the relevant product markets and geographic markets," taking into account several factors.  12 U.S.C. § 5514(b)(2).  Remarkably, in a Final Rule that spans 73 pages, the CFPB references this critical statutory text only once, and buries even that passing reference in a footnote.  89 Fed. Reg. at 99,601 n.154.

54.     The CFPB's suggestion that the risk-based supervision program requirement applies only *after* supervised nonbank entities have already been designated for supervision is illogical and violates the canon that different parts of a statute, and especially neighboring provisions and terms, should be interpreted harmoniously.  *See*, *e.g.*, *Tex. Dep't of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539 (2015); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) (under the "harmonious-reading canon," the "provisions of a text should be interpreted in a way that renders them compatible, not contradictory").  It would be a particularly unharmonious interpretation of the

statute—and contrary to the requirement that the CFPB conduct an *ex ante* cost-benefit analysis—to suppose that the Bureau could select a nonbank market for supervision without first identifying *some* consumer risk, given that "risks to consumers" is the *sine qua non* of the statute's "risk based supervision program."

55.     Indeed, each of the surrounding categories of nonbanks explicitly designated for CFPB supervision in Section 5514(a) are markets known for posing particular risks to consumers. *See* 12 U.S.C. § 5514(a)(1)(A, D, E) (authorizing supervision in connection with mortgage brokers, private educational loans, and payday loans). This statutory focus on consumer risk finds further expression in Section 5514(a)(1)(C), which authorizes the Bureau to supervise persons who fall outside a market identified as high risk only when the Bureau has "reasonable cause to determine . . . that such covered person . . . poses risks to consumers." *Id.* § 5514(a)(1)(C). It would make no sense as a matter of statutory interpretation, and violate the harmonious-reading canon, to posit that while all the other immediately surrounding provisions of the Bureau's nonbank supervision authority in Section 5514(a) are based on consumer-risk considerations, its larger participant supervision authority, codified in the *very same sub-section of the statute—id.* at § 5514(a)(1)(B)—somehow stands alone when it comes to risk. *See Peter v. Nantkwest, Inc.*, 589 U.S. 23, 31 (2019) (interpreting the term "expenses" by reference to and alongside "neighboring words in the statute"); *United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").

56.     Congress's instructions about how the Bureau should engage in nonbank supervision necessarily inform the selection and definition of any new markets for supervision. It would be nonsensical for Congress to require the CFPB to organize its supervision programs on

the basis of consumer risk, but at the same time empower the Bureau to ignore risk in selecting the particular markets in which to supervise "larger participant[s]." Because the Bureau must take into consideration the "risks posed to consumers" in exercising its risk-based supervision program, *see* 12 U.S.C. § 5514(b)(2), both the statutory structure and reasoned decision-making require that, in selecting a market for supervision, the Bureau consider whether supervision will allow it to identify and mitigate any actual consumer risk. And as a practical matter, it would make no sense for the Bureau to wait until after designating companies for supervision to only then evaluate and prioritize based on risk considerations. If, as it turns out, those companies pose no such risk, how then is the Bureau to prioritize, institute, or operate a "risk-based supervision program"? That cannot be what Congress intended.

57.    Indeed, this claim of standardless authority, if upheld, would render the larger participant provision of the Dodd-Frank Act violative of the non-delegation doctrine by failing to provide an intelligible principle under which the Bureau may exercise its nonbank larger participants rulemaking power and failing to provide regulated parties with any notice of what conduct might expose them to supervision. *See Gundy v. United States*, 588 U.S. 128, 135 (2019); *see also id*. at 161 (Gorusch, J., dissenting).

58.    The Bureau notes in passing that "[a]lthough the CFPB disagrees with the comments suggesting that it must make findings regarding risk to issue this larger participant rule and it does not do so here, as discussed above other commenters described various existing and emerging risks to customers that *may be* associated with products and services by larger participants" and "[t]hose comments raise legitimate concerns regarding potential concerns to consumers." 89 Fed. Reg. at 99,597 (emphasis added). This reference to various concerns raised by "other commenters"—and not the CFPB itself—is insufficient to justify the Final Rule and

would also improperly offload the CFPB's rulemaking responsibilities to "other commenters." Moreover, by its own admission, the CFPB did not evaluate the nature and veracity of these concerns; indeed, they are described only as mere possibilities that "may be" associated with the products in this purported market. *Id.* Nor did the CFPB rely on any of these "concerns" to justify its Proposed Rule, and thus commenters were deprived of any opportunity to comment on them, which is a "serious procedural error." *Owner-Operator Indep. Drivers Ass'n*, 494 F.3d at 199 (citing *Solite Corp.*, 952 F.2d at 484).

59.    In any event, none of the reasons offered by commenters and repeated by the Bureau in the Final Rule identified a specific "risk" in light of which a market could be properly defined. For example, the Bureau noted that it "shares the view of the group of State attorneys general and other commenters that this highly-concentrated market will continue to grow and evolve rapidly" and "it is important for the CFPB to be able to closely assess whether pressure to sustain high growth in this market will drive nonbank firms to develop new and increasingly risky products." 89 Fed. Reg. at 99,595. But rapid growth and evolution does not itself justify supervision. While consumer protection regulations must evolve with new technology, this neither negates nor satisfies the statutory requirement that the Bureau must take into account risks to consumers in identifying a market for larger participant supervision.[15]

60.    The Bureau also "agree[d] with the comments expecting that the market will continue to grow, including by expanding how general-use digital consumer payment applications help consumers to make payments in other ways." 89 Fed. Reg. at 99,595. It then noted that

---

[15] *See* TechNet Comment Letter at 7; FTA Comment Letter at 6 (observing that while "consumer protection regulations must evolve with new technology, the Bureau must nonetheless identify and assess the consumer harms that it perceives in the precise market at issue before it proposes a larger participant rule").

"[s]upervision can detect and assess risks that may arise from a single application establishing connections that can cause payments to be made from many different consumer accounts." *Id.* But again, generic and speculative predictions about what risks "may arise" in the future are not substitutes for identifying the types of concrete and existing risks to consumers that Congress explicitly required. And to the contrary, the Bureau ignored the obvious *benefits* to consumers from the platforms at issue, which offer convenient, efficient, low-cost offerings to consumers and present a remarkable technological breakthrough as compared to traditional financial services.

61.    The Bureau's refusal to consider risk is all the more striking given that Defendants have been engaged in a years-long inquiry into these same companies' varied payment products under the Bureau's market monitoring authority.[16] That authority allows the Bureau to "monitor for risks to consumers in the offering or provision of consumer financial products or services," 12 U.S.C. § 5512(c)(1), and it is meant to inform the Bureau's rulemaking and other activities, which would include larger participant rulemakings. The CFPB undertook its first round of market monitoring inquiries in October 2021, which covered a range of topics spanning payment product features, operating manuals, fees, data use practices, advertising practices, access restrictions, and fraud protection activities. *See* 2021 Market Monitoring Order, *supra* n.6. Shortly thereafter, the CFPB invited interested parties to submit comments to inform the Bureau's searching inquiry.[17] The CFPB then launched a second, expanded round of inquiries in January 2023. Despite all of those inquiries, the Bureau declined to make any findings about actual harms or risks to consumers in support of its selection of this purported market for larger participant supervision.

---

[16] *See supra* n.6.

[17] *See* CFPB, *Notice and Request for Comment Regarding the CFPB's Inquiry Into Big Tech Payment Platforms*, 86 Fed. Reg. 61,182 (Nov. 5, 2021).

62.     The CFPB's failure to consider risk to consumers not only violates the statute's requirements, but is also arbitrary and capricious, rendering the Final Rule invalid for that separate reason as well. *See* 5 U.S.C. § 706(2)(A); *Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("reasonable regulation ordinarily requires paying attention to the advantages *and* disadvantages of agency decisions"). An "agency regulation must be designed to address identified problems" and "problems with existing regulatory requirements that an agency has delegated authority to address." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 556-557 (D.C. Cir. 2020) ("*NYSE*"). An agency must consider every "important aspect of the problem," reach a conclusion based on the "evidence before the agency," and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

63.     As noted above, this Court recently observed in *PayPal* that the APA does not authorize the Bureau to "[t]ry to solve an imaginary problem" or to "dream[] up a problem in search of a solution." 728 F. Supp. 3d at 41, 45 (citation omitted). The Bureau must, instead, identify and address an *existing* problem requiring its intervention. *NYSE*, 962 F.3d at 556. It must also provide "some quantitative or qualitative assessment of the 'costs' of regulation . . . as well as its 'benefits.'" *PayPal*, 728 F. Supp. 3d at 45 (quoting 15 U.S.C. § 5512(b)(2)). Yet as in *PayPal*, "[t]he CFPB did neither." *Id.*

64.     Under this framework, the Bureau's position that it may altogether ignore risks to consumers in identifying a market for larger participant supervision is arbitrary and capricious. The Bureau's position ignores "an important aspect of the problem," which is that, under the CFPB's risk-based nonbank supervision program, the Bureau must exercise its supervisory authority by taking into consideration whether and if there are "risks to consumers" afoot. *See* 12

U.S.C. § 5514(b)(2); *see also PayPal*, 728 F. Supp. 3d at 39 n.3 ("questions we ask under the APA" include whether the agency "'fail[ed] to consider an important aspect of the problem,'" failed to "'explain why it has exercised its discretion in a given manner,'" or "'offer[ed] an explanation for its decision that runs counter to the evidence'" (quoting *State Farm*, 463 U.S. at 43, 48-49)).  It would ignore this important statutory feature were the Bureau to proceed with identifying larger participants for supervision in a manner that is willfully blind to risk considerations.

65.    By refusing to make any finding of risks to consumers in a product market or geographic market, the Bureau disclaims any standard by which to exercise its larger participant supervisory authority.  If the Bureau is not complying with the guardrails set forth by Congress in its statutory criteria for the risk-based supervision program, then it is entirely unclear what standard, if any, the Bureau believes governs its selection of markets to supervise and the threshold for larger participants in those markets.  The Bureau notably did not offer any alternative standard to govern its decision-making.  This standardless approach undermines the notice-and-comment process and judicial review, rendering each a formality without any substance.  Agency action is arbitrary and capricious if "it fails to articulate a comprehensible standard for assessing the applicability of a statutory category," largely because it thereby fails to provide a reasonable opportunity for comment.  *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (internal quotation marks and citation omitted).  When applying general terms like "market," an agency must "pour some definitional content" into the term by "defining the criteria it is applying," but the Bureau failed to do so here.  *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) (internal quotation marks and citation omitted).

66. Subjecting companies to onerous supervision without any finding of risk is precisely the sort of reliance on an "imaginary problem" to impose a preferred solution that the Bureau was warned against, and ultimately prevented from implementing, in *PayPal*. *See* 728 F. Supp. 3d at 45. The Final Rule should meet the same fate.

### 2. The CFPB Identifies No Gap in Regulatory Oversight

67. The Final Rule also fails to satisfy another objective standard that limits the Bureau's rulemaking authority: identifying a gap in the state supervision that already applies to many of the relevant payment applications that will be subject to the Final Rule. *See* 12 U.S.C. § 5514(b)(2)(D); *id.* at § 5514(b)(3). The CFPB is well-aware that state regulators are already active supervisors in this space: it expressly acknowledged "that States have been active in regulation of money transmission by money services businesses and that many States actively examine money transmitters." 89 Fed. Reg. at 99,586; *see also id.* at 99,643 (conceding that "some nonbank market participants already are subject to State supervision and also may be supervised by Federal prudential regulators in certain capacities"). Tellingly, the Bureau says only that there is "currently no *Federal* program for supervision of nonbank covered persons in the market for general-use digital consumer payment applications." *Id.* at 99,645-46 (emphasis added). Yet beyond its vague lip-service reference to "coordinat[ing] with appropriate State regulatory authorities in examining larger participants," *id.* at 99,586, the Final Rule never adequately explains: "(1) which rules and regulations the Bureau believes require additional compliance, (2) how much compliance there currently is, (3) how much incremental compliance would be achieved by supervision, or (4) why other alternative regulatory steps would not achieve that incremental amount of compliance." *See* Amazon.com Comment Letter at 12. By the Bureau's own admission, then, there is no oversight gap for it to fill.

68.    For example, as one commenter noted, companies with money transmitter licenses are already supervised by approximately fifty jurisdictions in successive multi-state or single-state exams.  These exams cover a wide range of topics and risk areas, including Federal consumer financial law.  *See* Amazon.com Comment Letter at 12.  The Bureau has not only ignored this long-standing state regulatory and supervisory system, but also fails to show why additional federal supervision would provide any worthwhile benefit.  *Id.* at 13.

69.    Indeed, those who have studied the issue have described an existing system of robust state supervision: "[M]ost state banking regulators regulate and supervise a variety of nonbank financial services providers, including money transmitters, for safety, soundness, and compliance with consumer protection and [anti-money laundering] laws.  Although state agencies have various frequency cycles for conducting examinations, most licensed money transmitters are examined annually by either multistate teams or individual states.  State supervisors review a money transmitter's operations, financial condition, management, compliance function, and compliance with AML laws.  Between exams, state regulators monitor their licensees on an ongoing basis by reviewing the information submitted pursuant to reporting requirements.  Additionally, money transmitters must meet financial statement reporting requirements, permissible investments adequacy, branch and agent listings, and transmission volume activity."[18]

70.    As TechNet pointed out, the Proposed Rule "glosses over and minimizes robust state and federal supervision over money transmitters," and "also fails to address how the CFPB's examinations will add value beyond the examinations already being conducted by the federal

---

[18] Andrew P. Scott, Cong. Rsch. Serv., R46486, *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* 3 (2020) (quoted in Amazon.com Comment Letter at 12 n.52); *see also* Marc Labonte, Cong. Rsch. Serv., R44918, *Who Regulates Whom? An Overview of the U.S. Financial Regulatory Framework* 16 (2020) (similar).

prudential regulators and the states, while downplaying the significant additional costs resulting from the duplication." TechNet Comment Letter at 10. The Final Rule addresses none of these defects, as the Bureau inexplicably declined to discuss the existing regime of state supervision at any significant length. Instead, it merely offered the vague assurance that it "takes seriously its inter-governmental coordination obligations," and the illogical assertion that *additional* oversight will somehow "minimize regulatory burden." 89 Fed. Reg. at 99,599. Nor did it did provide any evidence that state supervision was inadequate, or otherwise quantify what benefits CFPB supervision would offer above and beyond robust existing state supervision, contrary to what Congress required. *See* 12 U.S.C. § 5514(b)(2)(D); *id.* at § 5514(b)(3) (each requiring consideration of existing state oversight).

### 3.    The CFPB's "Market" Definition is Arbitrary and Capricious

71.    The Final Rule also violates the APA because the Bureau's definition of a market for consumer products and services is arbitrary and capricious.

72.    The Bureau must articulate the risks to consumers and noncompliance with Federal consumer financial laws that justify the designation of a market for supervision. The Bureau did not do so when it placed funds transfer functionality and wallet functionality in the same market for supervision. Nor could it, as the functionalities may present different risks (if any) and implicate different regulations.

73.    Specifically, the Final Rule defines the market "[p]roviding a general-use digital consumer payment applications" as "providing a covered payment functionality through a digital payment application for consumers' general use in making consumer payment transaction(s)." 89 Fed. Reg. at 99,653. A "covered payment functionality" is defined, in turn, as "funds transfer functionality," a "wallet functionality," or "both." *Id.* "Funds transfer functionality" includes

32

products in which "nonbanks help to transfer a consumer's funds to other persons, sometimes referred to as [peer-to-peer] transfers," *see id.* at 99,616, while "wallet functionality" includes products that "store[] . . . account or payment credentials, including in encrypted or tokenized form." *Id.* at 99,653.

74.    A critical difference between the two categories is that many wallet functionalities do not hold value or provide customers access to their funds. *See*, *e.g.*, FTA Comment Letter at 14 ("A pass-through wallet should not be considered a covered payment functionality . . . because the company providing this type of wallet is not involved in the holding, transmission, or receipt of funds and is merely a record holder."); Chamber of Progress Comment Letter at 3 (Jan. 8, 2024), Docket No. CFPB-2023-0053, https://www.regulations.gov/comment/CFPB-2023-0053-0053 ("Chamber of Progress Comment Letter") ("[T]he terms 'wallet functionality' and 'funds transfer functionality' suggested by the Bureau as interchangeable to consumers are actually not the same products and services, and should not be grouped together in the Proposed Rule."). The Bureau, however, disregarded these comments and amalgamated these products with no meaningful explanation.

75.    The Bureau acted arbitrarily and capriciously in defining a market because P2P products and wallets would present different theoretical risks, to the extent they pose any risks at all, and implicate different regulations. Yet the CFPB failed to address these differences, which the Dodd-Frank Act identifies as critical criteria. *See PayPal*, 728 F. Supp. 3d at 40 (requiring consideration of different "consumer risks" among products); 12 U.S.C. § 5514(b)(1)(A), (C), (b)(2)(C) (criteria for supervision).

76.    Indeed, this is not the first time that the CFPB has ignored critical product differences in its rulemaking, or even the first time that it has done so in connection with "digital

wallets." *See PayPal*, 728 F. Supp. 3d at 45 (striking down CFPB rule for failure to consider in detail distinctions between "digital wallets" and "general-purpose reloadable cards"). As this Court held in *PayPal,* when products are "different in kind," the CFPB may not "dismiss[]" or "shrug off" the "cited differences" as "irrelevant" unless it can "explain *why* the differences between products are irrelevant, or *why* their one similarity is somehow more consequential than those material differences." *Id.* at 39-40. To do so, it must identify "evidence, statistics, reports, or competing analyses" to support its conclusion, rather than make "conclusory" claims that it is "not convinced" or "not persuaded" that products are "fundamentally dissimilar." *Id.* at 39.

77.    The CFPB has again made the same "missteps" as in *PayPal* by failing to meaningfully address the product differences included within its defined market. *See PayPal*, 728 F. Supp. 3d at 40 (requiring consideration of different "consumer risks" among products). The Bureau's failure to make product distinctions is all the more suspect given its acknowledgment that it was indeed "grouping activities that are in some ways different into a single market." 89 Fed Reg. at 99,603 at n.76; *see also id.* at 99,615 (conceding that the two covered "functionalities . . . may differ in some ways," including in regards to their "technological and commercial processes").

78.    What's more, even products with "funds transfer functionality" are not one-size-fits-all for market definition purposes. *See*, *e.g.*, FTA Comment Letter at 1 (noting that "companies offering digital applications for person-to-person ('P2P') transfers are fundamentally different from companies that process payments for merchants."). As TechNet already explained to the Bureau, the proposed market definition is woefully overbroad because it amalgamates together companies that offer altogether disparate services: some allow consumers to make payments using a stored balance held by that company; others route funds from a consumer's bank account for

transmission to a third party; while still others offer payment methods to facilitate the purchase of goods and services from merchants, which is generally exempt from regulated money transmission by the states because of the minimal potential risk posed to consumers. *See* TechNet Comment Letter at 5; *see also* Computer & Communications Industry Association Comment Letter at 13 (Jan. 8, 2024), Docket No. CFPB-2023-0053, https://www.regulations.gov/comment/CFPB-2023-0053-0048 ("CCIA Comment Letter") (similar). And that's to say nothing of the wallet companies, which "merely hold[] and pass[] payment information, such as card numbers, but never participate[] in the flow of funds from the consumer to the third-party recipient." TechNet Comment Letter at 5.

79. To the extent that the Final Rule identifies any problem that it is designed to solve through its artificial market definition, the Bureau claims that the Final Rule will improve the larger participants' compliance with the "prohibition against unfair, deceptive, and abusive acts and practices [UDAAP], the privacy provisions of the Gramm-Leach-Bliley Act (GLBA) and its implementing Regulation P, and the Electronic Fund Transfer Act (EFTA) and its implementing Regulation E." 89 Fed. Reg. at 99,586. But the Bureau does not explain how or why supervising wallet applications, for example, would prevent any risks to consumers arising under these consumer financial laws. As noted above, many wallet applications do not hold customer funds, but merely offer customers the convenience of holding their payment credentials (such as a credit card or a debit card) and causing these cards to be charged to facilitate a payment to a merchant. The Bureau has not explained how Regulation E or Regulation P applies to such wallet services. Even assuming that the UDAAP prohibition could apply to wallet applications, the Bureau has not identified any UDAAP violations or risks of UDAAP violations by wallet applications.

80.    To be sure, the CFPB attempted to justify its decision not to "differentiate" among the disparate products within its Frankenstein market by stating that *some* industry participants provide both funds transfer functionalities and wallet functionalities, designing "seamless, undifferentiated common user experience[s]" for their consumers. 89 Fed. Reg. at 99,605. The CFPB did not claim, however, that this is the case across the board—on the contrary, it expressly recognized that some firms have chosen to "discontinue offering payments" while others "have not yet enabled that capability in the United States." *Id.* That some companies may offer both functionalities does not give the CFPB carte blanche to exercise supervisory authority over all products offering these distinct functionalities, when wallet functionalities do not implicate the regulations identified by the CFPB.

## B. The CFPB's Expansive Assertion of Supervisory Authority Over Products Outside Its "Market" Is Unlawful

81.    Even if the CFPB could justify its proposed market for "general-use digital consumer payment applications"—and it cannot—the Bureau has no statutory authority to extend that mandate to a company's activities outside that market and that are not otherwise subject to supervision under the risk-based standards that Congress carefully set out. But that breathtaking assertion of its own jurisdiction is exactly what the Bureau claims.

82.    In the Dodd-Frank Act, Congress specifically provided that the CFPB can issue a larger participant rule only if the Bureau defines the particular "market." 12 U.S.C. § 5514(a)(1)(B), (a)(2). The Act also provides that "[t]he Bureau shall exercise its authority . . . based on the assessment by the Bureau of the risks posed to consumers in the *relevant product markets* and geographic markets." *See* 12 U.S.C. § 5514(b)(2) (emphasis added).

83.    The Bureau's supervisory authority therefore extends only to the "relevant" product market—and not to any and all consumer financial product and service markets in which a designated entity might participate. *See Chamber of Commerce*, 691 F. Supp. 3d at 742 (vacating update to Exam Manual where the CFPB claimed authority beyond the scope of Congress's mandate, and recognizing that "Congress knew how to clearly add . . . to the CFPB's portfolio when it meant to do so"). As discussed above, Congress expressly limited the Bureau's supervisory authority to the specifically delineated categories set out in Section 5514(a)(1)(A-E). That decision necessarily implies that Congress was limiting the scope of such supervision to those categories of activity that qualified the entity for supervision. Were it otherwise, the Bureau would have an unfettered ability to circumvent the CFPA's reticulated supervisory structure.

84.    The Proposed Rule nonetheless allowed the CFPB to supervise an entity's products and activities offered even *outside* of the general-use digital consumer payment application "market." Specifically, the Bureau asserted the authority to supervise *any* consumer financial products or services offered by a company so long as that company offers *one* product that qualifies for supervision. *See* 88 Fed. Reg. at 80,198 n.7.

85.    Numerous commenters assailed this obvious overreach—to no avail.[19] As TechNet put it, the "position that the CFPB can exercise its supervisory authority over an entire entity is not grounded in any statutory authority. There is no clear mandate permitting the Bureau to supervise

---

[19] *See, e.g.*, Amazon.com Comment Letter at 13; NetChoice Comment Letter at 7; CCIA Comment Letter at 9; American Consumer Institute Comment Letter at 2 (Jan. 8, 2024), Docket No. CFPB-2023-0053, https://www.regula-tions.gov/comment/CFPB-2023-0053-0039 ("American Consumer Institute Comment Letter"); Members of Congress Comment Letter at 2; McGuireWoods Comment Letter at 9-10 (Jan. 8, 2024), Docket No. CFPB-2023-0047, https://www.regulations.gov/comment/CFPB-2023-0053-0047; *see also* 89 Fed. Reg. at 99,592 (summarizing criti-cisms of the CFPB's "description of its supervisory authority").

all aspects of a company merely because the Bureau has authority to supervise *one* activity."

TechNet Comment Letter at 4.

86.    Indeed, the Final Rule persisted in fundamentally mischaracterizing the Bureau's

statutory authority.  It does not engage with the commenters' criticisms under the statute other than

a conclusory footnote in which the CFPB merely notes that it "disagrees" that the "reference to

'relevant product markets and geographic markets'" in 12 U.S.C. § 5514(b)(2) was intended to

"limit the scope of [its] authority under 12 U.S.C. 5514(a)(1) and (b)(1) to only the consumer

financial products and services described in the larger participant rule." *See* 89 Fed. Reg. at 99,600

n.152.  But that is pure *ipse dixit*, belied by the statutory text, which the Bureau does not even try

to justify as a matter of statutory construction.

87.    The CFPB also purports to "clarif[y]" that its position that its supervisory authority

is not limited to the consumer financial products or services that qualified a company for

supervision is not a "rationale for the Final Rule" and that it would have promulgated the Final

Rule "irrespective of the existence of that position."  89 Fed. Reg. at 99,600.  But that

"clarification" is thin gruel to Plaintiffs and their member companies who will now find themselves

potentially subject to federal supervision over *any* financial product or service they offer if the

Final Rule is left standing.  And, at a minimum, if this is in fact the CFPB's position about the

scope of authority conferred by the Final Rule, the CFPB was required to take this into account in

its cost-benefit analysis (and failed to do so).  Contrary to the CFPB's dismissive statement, it is

required to take a view on the scope of its supervisory authority under the Final Rule—and the

expansive view it has chosen is unlawful and should be set aside by this Court.

88.    The Bureau's expansive position runs headlong into the major questions doctrine,

under which an agency like the CFPB must have "clear congressional authorization" to wield

substantial authority over a matter of "vast economic and political significance." *See West Virginia*, 597 U.S. at 716. A "merely plausible textual basis" will not do. *Id.* at 723. That is because Congress is expected "to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

89.    "That is exactly the kind of power the [CFPB] claims here." *Ala. Ass'n of Realtors*, 594 U.S. at 764. It baldly claims authority to supervise *entire entities*, rather than a specific product that falls within a specific market. But authority over certain qualifying products in a specific market is the *only* "clear congressional authorization" to be found in the statute. Because the CFPB can point to no "clear statement" from Congress that delegates the vast authority it claims, *see West Virginia*, 597 U.S. at 717, the Final Rule fails under the major questions doctrine.

**C. The Bureau's Cost-Benefit Analysis Was Fatally Deficient**

90.    Agency action is "arbitrary and capricious" under the APA when the agency fails to "consider[] the costs and benefits associated" with the action. *Mex. Gulf Fishing Co. v. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023).

91.    And the Dodd-Frank Act requires the Bureau to consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from" regulation. 12 U.S.C. § 5512(b)(2). Section 5512 empowers the Bureau to "exercise its authorities under Federal consumer financial law to administer, enforce, and otherwise implement the provisions of Federal consumer financial law," 12 U.S.C. § 5512(a), and to "prescribe rules" that are "necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial

laws, and to prevent evasions thereof," 12 U.S.C. § 5512(b)(1). Thus, all rulemaking by the Bureau must be tethered to administering, enforcing, or otherwise implementing Federal consumer financial laws. *See Seila Law*, 591 U.S. at 206. As the Supreme Court has instructed in interpreting the "necessary and appropriate" standard, such rulemaking must consider "the advantages *and* the disadvantages of agency decisions," including "cost" and every other "important aspect of the problem"—which, in the context of this rulemaking, would naturally include consumer risk. *Michigan*, 576 U.S. at 752-53.

92.    The CFPB's cost-benefit analysis was fundamentally flawed from the outset. How could the Bureau determine whether the benefits of supervision would outweigh the costs without assessing consumer risk and considering whether there are gaps in state regulation? If there is no or minimal consumer risk, or if any risks are addressed by state regulation, then the costs necessarily would outweigh the non-existent benefits. The CFPB's failure to examine those factors and determine that they justified the Final Rule therefore violated both the APA and the specific cost-benefit requirement in the Dodd-Frank Act.

93.    Moreover, in issuing the Final Rule, the Bureau violated both the APA and the Dodd-Frank Act because it undertook a superficial cost-benefit analysis that, among other things, failed to adequately consider important costs.

94.    As a threshold matter, the Bureau failed to meaningfully attempt to quantify and assess the actual costs and benefits, and instead relied on qualitative speculation. As the Bureau admits, "limited data are available with which to quantify the potential benefits, costs, and impacts of the Final Rule." 89 Fed. Reg. at 99,642. And the Bureau "lacks detailed information" about the rate of compliance of the entities to be supervised under the rule with Federal consumer financial law, and "about the range of, and costs of, compliance mechanisms used by market

participants." *Id.*  It was the Bureau's obligation, however, to obtain that quantitative data for its cost-benefit analysis, and its failure to obtain and rely upon accurate data in its cost-benefit analysis violates its statutory obligation to "support its rulemaking" by, among other things, "gather[ing] and compil[ing] information from a variety of sources."  12 U.S.C. § 5512(c)(4)(B)(i); *see also State Farm*, 463 U.S. at 43 (agencies "must examine the relevant data and articulate a satisfactory explanation for its action").  The CFPB's failure to obtain necessary data does not justify the superficial, "qualitative" assessment it undertook.  89 Fed. Reg. at 99,642.

95.     Engaging in this inadequate qualitative analysis, the Bureau inflated the benefits that would be obtained from increased compliance and reductions in unspecified risk to consumers, while severely underestimating or ignoring the significant costs to larger participants from installing compliance infrastructure for a new regulatory regime of unknown scope.  The Bureau's excuse that it lacks "detailed information," *see* 89 Fed. Reg. at 99,642, is particularly troubling because the Bureau has authority to seek information from providers of consumer financial products and services (its so-called "market monitoring" authority).  12 U.S.C. § 5512(c)(4)(B)(ii). This authority was specifically created "to support [the Bureau's] rulemaking" processes and allows the Bureau's methods and findings to be shared with those seeking to comment on proposed rules.  *Id.* § 5512(c)(1).  The Bureau has used this authority to engage in factfinding efforts for past rulemakings, where it presented sufficiently detailed data to enable meaningful evaluation of, and comment on, its conclusions.  But the Bureau did not do so here, and its "failure to adduce empirical data that can readily be obtained" violates basic principles of administrative law.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009).

96.     The Bureau's analysis is flawed in several other respects.  For example, the Bureau's consideration of the costs associated with increased compliance in anticipation of Bureau

supervision is contradictory and noncommittal.  After asserting that "it is likely that many larger participants would increase compliance in response to the CFPB's supervisory activity authorized by the Final Rule[,]" the Bureau stated in the very same paragraph that it lacks the data necessary to "support a specific quantitative estimate or prediction."  89 Fed. Reg. at 99,643.  The Bureau stated that "because the Final Rule itself would not require any provider of general-use digital consumer payment applications" to increase compliance, it cannot predict increased compliance without "an estimate of current compliance levels and a prediction of market participants' behavior in response to a Final Rule."  *Id.*

97.    In the same breath, though, the Bureau touted the purported benefits to consumers of the new, expansive compliance framework it was introducing.  Just after saying that it cannot estimate to what extent larger participants would have to increase their compliance efforts, the Bureau assumed that one of the Final Rule's benefits would be "[i]ncreased compliance with Federal consumer financial laws."  *Id.* at 99,643.

98.    The Bureau cannot have it both ways.  Either the increase in compliance in response to possible supervision will be negligible, and both the costs and benefits will be minimal; or the Final Rule will amplify compliance efforts, with attendant significant costs and benefits.  What the Bureau has done, however, is effectively tamp down its cost estimate by touting the purported uncertainty of any increase in compliance—notwithstanding the vast knowledge on that front that it already has accumulated from its years of supervision over large banks—while inflating its benefits estimate by assuming the Final Rule will ensure widespread adoption of consumer protection compliance practices.

99.    Moreover, because the Bureau admittedly lacks data about the current level of compliance by larger participants with Federal consumer protection laws, it failed to consider the

possible cost of additional, unnecessary, and costly compliance measures undertaken out of an abundance of caution.

100.    The Bureau also dramatically understated the costs of supervisory activities in several respects.  The Bureau's cost analysis is flawed from the start: the Bureau "does not consider the costs of establishing a compliance management system to be part of the cost of supporting the supervisory activity itself."  89 Fed. Reg. at 99,646 n.401.  This is because "[f]irms are expected to have the systems and policies necessary to ensure they comply with existing" Federal consumer legal requirements.  *Id.*  But this ignores the reality, to which several commenters to the Proposed Rule drew the Bureau's attention, that firm responses to supervisory examinations are vastly different in size and scope from routine compliance activities and can necessitate significant expenditures of time and money.

101.    An additional flaw in the Bureau's analysis is that it assumed that "the cost to a larger participant of supporting a typical eight-week on-site examination should not vary significantly depending on which consumer financial products or services are scoped into the examination."  *Id.*  This is an illogical assumption on its face.  If, as the Bureau asserts, it can supervise *all* consumer financial products or services offered by a larger participant—and not just the specific product(s) that made the entity a larger participant in the first place—the number of exams that a company might potentially face would meaningfully increase given that exams are usually product-specific in nature.  Yet the CFPB improperly shrugged this issue aside in estimating the costs and burdens of supervision.

102.    To the extent the Bureau does attempt to quantify the costs of supervisory activities, its estimates are unsupported by available evidence.  The Bureau estimates that the total employer cost of labor to comply with an examination ranges from $39,000 at the low end, to $392,000 at

the high end.  89 Fed. Reg. at 99,648-49.  Assuming that half of the seven potential larger participants undergo supervision in a given year, the Bureau estimated the total industry-wide cost of supervisory activity to be approximately $1.4 million ($392,000 x 3.5).  *Id.* at 99,649.  Although the Bureau revised its cost estimate upward (from its previous, egregiously erroneous estimate of $25,001) in response to a flood of comments on the Proposed Rule, the estimate in the Final Rule still rests on several erroneous assumptions, including that:

a. An examination will last only 12 weeks.  *Id.* at 99,648.

b. The mean hourly wage in the top-paying metropolitan area for compliance officers is $56, and for lawyers is $129.[20]  *Id.*

c. That firms would only retain, on the upper end of estimates, one outside counsel at an hourly rate of $917.  *Id.* at 99,648 n.412.

d. That outside counsel would only spend 20 hours on preparation and 10 hours of support for a Bureau examination.  *Id.*

103.    In short, the Bureau vastly underestimated the time and labor involved in preparing for a supervisory examination of a large firm, as well as the wages of professionals required to properly respond to a supervisory examination.  What's worse, the Bureau's systematic underselling of the costs involved is simply not credible given its years of supervisory experience in the large banking sector; to claim that it has no evidence of the hefty compliance costs associated with supervision is to make a mockery of the cost-benefit analysis it was required by law to undertake.

---

[20] In the Proposed Rule, the Bureau derived these hourly wages from the U.S. Bureau of Labor Statistics (BLS), which merely estimated "mean hourly wages" for a generic "lawyer"; the Bureau did not consider whether that estimate is representative of those lawyers who would have the specialized skillset to work on complex administrative supervisory matters.  *See* 88 Fed. Reg. at 80,213 and n.105 (citing BLS estimates for "lawyers"); *see also* Final Rule, 89 Fed. Reg. at 99,646 and n.404 (same).

104.    Compounding the uncertainty of the Bureau's cost estimate, the Bureau "decline[d] to predict . . . precisely how many examinations it will undertake at each larger participant of general-use digital consumer payment applications." 89 Fed. Reg. at 99,649 n.416. But not only did the Bureau fail to make a *precise* estimate of examination frequency, it made *no* estimate of any kind.

105.    As noted above, the Bureau also failed to consider that supervised entities are already subject to supervision at the state level, and thus any benefits of further federal supervision would be *de minimis* in comparison to the costs.

106.    The Bureau also failed to meaningfully consider whether and to what extent consumers of general-use digital consumer payment applications could potentially bear increased costs. Again admitting that it "lacks detailed information" about "the extent to which increased costs [of compliance] would be borne by providers or passed on to consumers," the Bureau stated that the decision about whether to "increase resources dedicated to compliance and/or pass those costs on to consumers would depend not only on the entities' current practices and the changes they decide to make," as well as on "market conditions." 89 Fed. Reg. at 99,644. This contradicts the requirement of the Dodd-Frank Act that the Bureau consider "the potential reduction of access by consumers to consumer financial products or services resulting from" the Final Rule. 12 U.S.C. § 5512(b)(2). Whether and to what extent there is increased cost to consumers of using general-use digital consumer payment applications—which are currently largely available to consumers at *no* cost—is a quintessential question of reduction of access the Bureau was required to give due consideration, yet did not.

107.    Basing its consideration on its "high" estimate of $1.4 million total industry-wide cost of compliance, the Bureau speculated that this figure represents such a small portion of firms'

overall revenue that it is "less likely that these costs would cause firms to substantially change their business models." 89 Fed. Reg. at 99,650. The Bureau also speculated, without foundation, that merchants and consumers can choose no-fee options if one larger participant begins charging a fee for use.

108. The Bureau further estimated that even if larger participants did pass through the entire cost of compliance to merchants or consumers, the cost per person or entity would be low. 89 Fed. Reg. at 99,650. But earlier in its analysis, the Bureau admitted that it "cannot foresee how larger participants may respond to the cost of supervision." *Id.*

109. Nor, for that matter, did the Bureau adequately analyze the blow to innovation that will be inflicted by the Rule. Supervised entities may pass the cost of supervision on to consumers not merely through increased fees, for example, but by decreased access to consumer financial products and services when those entities are inhibited from developing new products.

110. Because it fails to properly consider costs and benefits, and includes no finding that the benefits of the Final Rule outweigh the costs, the Final Rule violates the Dodd-Frank Act and the APA and fails the basic test of reasoned decision-making. *See Michigan*, 576 U.S. at 751.

## CLAIMS FOR RELIEF

### COUNT I

**In Excess of Statutory Authority (Failure to Consider Harms or Risks to Consumers)**
**5 U.S.C. § 706(2)(C)**

111. Plaintiffs incorporate paragraphs 1-110 as though fully set forth herein.

112. In identifying a purported market for larger participant supervision, the Bureau violated the Dodd-Frank Act by failing to consider or make findings of risks to consumers. Instead,

the Bureau has assumed that it has standardless discretion for designating a market for nonbank supervision.

113.    The Bureau also failed another objective standard by not meaningfully considering existing state supervision that already applies to many of the financial products or services that will be subject to the Final Rule, and thus not identifying any gap in oversight that it seeks to fill.

114.    The major-questions doctrine forecloses agencies from claiming "sweeping and consequential authority" absent "clear congressional authorization." *West Virginia*, 597 U.S. at 721-23.    The Bureau's claimed standardless authority to designate any nonbank market, regardless of risks, for supervision violates this doctrine.

115.    The Bureau's posited standardless authority would render the larger participant provision of the Dodd-Frank Act a violation of the nondelegation doctrine, and the Court should interpret the statute to avoid that constitutional concern.  *See Gundy*, 588 U.S. at 135; *id.* at 149 (Gorsuch, J., dissenting).

116.    The Final Rule therefore exceeds the CFPB's statutory authority and must be set aside.  *See* 5 U.S.C. § 706(2)(C).

## <u>COUNT II</u>

**In Excess of Statutory Authority (Assertion of Supervisory Authority Over Activities Outside the Relevant "Market")**
**5 U.S.C. § 706(2)(C)**

117.    Plaintiffs incorporate paragraphs 1-116 as though fully set forth herein.

118.    In the Dodd-Frank Act, Congress specifically provided that the CFPB can issue a larger participant rule only if the Bureau defines the particular "market," 12 U.S.C. § 5514(a)(1)(B), (a)(2), and "exercise[s] its authority" based on "the risks posed to consumers in the

*relevant product markets* and geographic markets." *See* 12 U.S.C. § 5514(b)(2).  Congress thus specifically provided that the CFPB's supervisory authority would extend only to the "relevant" product market—and not to all other consumer financial product and service markets in which a designated entity might participate.  The CFPB's position that the CFPB can exercise its supervisory authority over the entirety of an entity's consumer financial products or services, regardless of how remote they may be from the products and services that purportedly qualify for market-based supervision in the first place, is not grounded in any statutory authority.

119.    By nonetheless claiming the authority to supervise *any* consumer financial products or services offered by a covered company, so long as that company offers *one* product that qualifies for supervision, the Bureau has exceeded its authority under the Dodd-Frank Act, *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369, 398-99 (2024), violated the major questions doctrine, *West Virginia*, 597 U.S. at 722-723, and the authority it posits would render the larger participant provision of the Dodd-Frank Act an unlawful delegation of power, *see Gundy*, 588 U.S. at 135; *id.* at 149 (Gorsuch, J., dissenting).

120.    The Final Rule therefore exceeds the CFPB's statutory authority and must be set aside.  *See* 5 U.S.C. § 706(2)(C).

## COUNT III

**In Excess of Statutory Authority (Inadequate Cost-Benefit Analysis)**
**5 U.S.C. § 706(2)(C)**

121.    Plaintiffs incorporate paragraphs 1-120 as though fully set forth herein.

122.    The Bureau failed to perform the cost-benefit analysis required by the Dodd-Frank Act, including, among other things, by failing to obtain and consider data about the costs of the

rule and failing to adequately consider the reduction of access to consumer financial products and services occasioned by the Rule.

123.    The Final Rule therefore exceeds the CFPB's statutory authority and must be set aside.  *See* 5 U.S.C. § 706(2)(C).

## COUNT IV

### Arbitrary and Capricious (Failure to Consider Harms or Risks to Consumers)
### 5 U.S.C. § 706(2)(A)

124.    Plaintiffs incorporate paragraphs 1-123 as though fully set forth herein.

125.    By identifying a purported market for larger participant supervision without considering or make findings on consumer harm or risks to consumers, the Bureau acted arbitrary and capriciously by, among other things, failing to consider an important part of the problem.

126.    The Bureau also acted arbitrarily and capriciously by failing to specify a purported standard for identifying markets for larger participant supervision, thus undermining notice-and-comment and judicial review.

127.    The Final Rule is therefore arbitrary and capricious and must be set aside.  *See* 5 U.S.C. § 706(2)(A).

## COUNT V

### Arbitrary and Capricious (Failure to Identify an Appropriate "Market")
### 5 U.S.C. § 706(2)(A)

128.    Plaintiffs incorporate paragraphs 1-127 as though fully set forth herein.

129.    By combining funds transfer functionalities and payment wallet functionalities into a single market, the Bureau defined an arbitrary and incoherent market.  The Bureau ignored pertinent regulatory differences between these two functionalities, and imposed a one-size-fits-all

regulatory scheme, without adequate justification, where different products implicate different risks (if any) and different laws.

130.    The Final Rule is therefore arbitrary and capricious and must be set aside.  *See* 5 U.S.C. § 706(2)(A).

## COUNT VI

### Arbitrary and Capricious (Assertion of Oversight Beyond the Relevant "Market")
### 5 U.S.C. § 706(2)(A)

131.    Plaintiffs incorporate paragraphs 1-130 as though fully set forth herein.

132.    The Bureau acted arbitrarily and capriciously in claiming the ability to supervise the entirety of a covered entity's consumer financial products and services, including as relates to products that plainly fall well outside of the entity's "general-use digital consumer payment application" market.  By claiming this additional authority, the Bureau has exponentially increased the scope and size of its supervisory authority, while ignoring comments challenging this overreach.  The resulting "market" is no market at all.

133.    The Final Rule is therefore arbitrary and capricious and must be set aside.  *See* 5 U.S.C. § 706(2)(A).

## COUNT VII

### Arbitrary and Capricious (Inadequate Cost-Benefit Analysis)
### 5 U.S.C. § 706(2)(A)

134.    Plaintiffs incorporate paragraphs 1-133 as though fully set forth herein.

135.    The Bureau acted arbitrarily and capriciously in purporting to assess the costs and benefits of the rule under the Dodd-Frank Act, including, among other things, by failing to obtain and/or meaningfully consider data about the costs of the rule; failing to meaningfully consider existing state supervision that already applies to many of the financial products or services that

will be subject to the Final Rule; and failing to adequately consider the reduction of access to consumer financial products and services occasioned by the Final Rule. The Bureau also failed to make a finding—nor could it—that the benefits of the Final Rule outweighed its costs.

136.    The Final Rule is therefore arbitrary and capricious and must be set aside. *See* 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court enter an order and judgment:

1.  Vacating and setting aside the Final Rule;

2.  Declaring that the Final Rule exceeds the Bureau's statutory authority, is arbitrary and capricious, and contrary to law;

3.  Permanently enjoining Defendants and any relevant officers, employees, and agents from commencing supervision, enforcing, implementing, applying, or taking any action whatsoever under, or in reliance on, the Final Rule;

4.  Awarding Plaintiffs the costs of this litigation, including reasonable attorney's fees; and

5.  Entering such other and further relief as this Court may deem just and proper.

Dated: January 16, 2025

Respectfully submitted,

/s/ Andrew J. Pincus
_____
Andrew J. Pincus (Bar No. 370762)
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

David Yolkut (*pro hac vice* motion
forthcoming)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500
dyolkut@mayerbrown.com

*Counsel for Plaintiffs*